[No. S030181. June 27, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
ROSARIO MONTOYA, Defendant and Appellant.

COUNSEL

·Colin J. Heran, under appointment by the Supreme Court, and Mark E. Cutler for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry, Rosendo Pena, Jr., and Jane Olmos, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, J.**—Defendant Rosario Montoya was convicted of burglary of an inhabited dwelling. Under the instructions given to the jury, its verdict could have been premised upon defendant's being found guilty of burglary either as a direct perpetrator or as an aider and abettor.

On appeal, defendant contends his conviction should be reversed on the ground the trial court erred in failing sua sponte to instruct the jury that, in order to be found guilty of burglary on a theory of aiding and abetting, a person (having knowledge of the unlawful purpose of the perpetrator) must have formed the requisite intent to commit, encourage, or facilitate the commission of the burglary *prior to or at the time the perpetrator entered the dwelling*. The People disagree, maintaining that a person who, with the requisite knowledge and intent, aids the perpetrator, may be found liable on an aiding and abetting theory so long as he or she formed the intent to commit, encourage, or facilitate the commission of the offense *prior to the time the perpetrator departed from the dwelling*. In addition, the People contend that, in any event, reversal of defendant's conviction would be unwarranted because, in light of the record in the present case, the trial court had no duty, absent a specific request by defendant, to instruct the jury with regard to the point in time by which an aider or abettor must have formed the intent to encourage or facilitate the commission of the offense.

As we shall explain, we conclude the People's contentions are well taken. Accordingly, we affirm the judgment of the Court of Appeal, upholding defendant's conviction.

I

By information, defendant Rosario Montoya and codefendant Raymond Gaxiola were charged with burglary of an inhabited dwelling, in violation of Penal Code section 460, former subdivision 1 (now Pen. Code, § 460, subd. (a)).[1] Each defendant also was charged with resisting arrest, in violation of section 148. Codefendant Gaxiola subsequently pleaded guilty to both charges and defendant only to the violation of section 148.

Because, in our discussion, we analyze the issue whether under the facts of this case the trial court was required to instruct sua sponte on a particular aspect of aiding and abetting, we consider it necessary to set forth in detail the evidence introduced during the jury trial that ensued on the remaining burglary charge against defendant.

---

[1] All further statutory references are to the Penal Code.

The information also alleged that the offense was a serious felony within the meaning of section 1192.7, subdivision (c)(18), and that the offense rendered both defendants ineligible for probation pursuant to section 462, subdivision (a). In connection with the burglary charge, defendant also was alleged to have suffered three prior convictions for which he served separate prison terms within the meaning of section 667.5, subdivision (b). Prior to the commencement of defendant's trial, proceedings to determine the truth of the prior conviction allegations were bifurcated (subject to admission of the allegations for purposes of impeachment, should defendant testify).

The following evidence was presented during the prosecution's case-in-chief. Alicia Hernandez was a close friend of Dolores Candolita and Anna Salcido, who were sisters. Salcido and her boyfriend, Gaxiola, lived together intermittently, and, during the summer of 1990, the two of them on several occasions visited Hernandez at the two-bedroom apartment on Mount Vernon Street in the City of Bakersfield which she and her children occupied. On another occasion Gaxiola alone visited Hernandez in order to make a repair. Salcido's and Gaxiola's relationship ended in September 1990. On September 17, 1990, after Gaxiola removed his belongings from Salcido's apartment, she observed Gaxiola being driven away by defendant in a green Datsun.

On September 26, 1990, Candolita and her children spent the night at Hernandez's apartment. On the following morning, Candolita drove Hernandez to work and the children to school, returned to the apartment, and departed again at approximately 8:45 a.m. At that time, a pole was in place in the door runway of the sliding glass door (which otherwise had no lock), opening onto a small fenced-in patio at the rear of the apartment. Candolita locked the front door, which had a key lock and dead bolt, using the only key available, which operated the dead bolt.[2]

At approximately 10 o'clock that morning, Maria Perez left her apartment, which was located near Hernandez's, and walked through the area behind the apartments toward her daughter's nearby apartment in order to meet her son, Alfred Garza, who was to drive her to work. Perez observed an unoccupied green Datsun automobile (a 210 model) parked in the asphalt parking area behind the apartments, facing a dirt easement (which ran next to the fence enclosing Hernandez's apartment patio and was too narrow for a vehicle). After approximately 10 minutes, Perez and her son, departing from her daughter's apartment, observed that the doors and trunk of the green Datsun had been opened. As they drew near in Garza's automobile, they noticed a man, identified as defendant, standing next to the passenger side of the vehicle, facing the open door, and holding up a map, which obscured his face from their view. Garza noticed another man, identified as Gaxiola, approaching along the dirt easement behind the apartments, carrying a television set. Perez told Garza to stop the automobile so that she could see "what was going on."

Perez approached Gaxiola, who was standing next to the driver's side of the vehicle with the television set in his hands, and asked what he was doing there. Gaxiola informed her "they were moving some things that belonged to

---

[2] In rebuttal, however, Candolita testified that, when she left the apartment that morning, she locked the doorknob lock and left the dead bolt unlocked.

his cousin" and would leave shortly. Defendant did not say anything and did not look up while Perez spoke with Gaxiola. When Perez told Gaxiola to move the automobile, he responded that they were leaving. After noticing a Nintendo game and a videocassette recorder inside the Datsun, Perez returned to her son's vehicle and told him to remember the make and license plate number of the Datsun. Perez and her son then drove away.

When Candolita returned to Hernandez's apartment at approximately 10:30 that morning, she discovered that someone had entered the apartment, taken several items of property, and left several knives, peanut butter, jelly, and a loaf of bread on the kitchen table. Candolita telephoned Hernandez to inform her and, at Hernandez's direction, telephoned the sheriff's department and picked up Hernandez at work. At the apartment, Hernandez discovered that a television set, videocassette recorder, Nintendo game, radio, and some items of jewelry were missing. The women noticed a baseball cap on the couch that did not belong to anyone residing in the apartment.

Deputy Sheriff Kenneth Williams and several sheriff's department investigators arrived at Hernandez's apartment shortly before noon. They and the victim observed the sliding glass door leading to the patio was closed, but the pole was not in the door runway, and there were new pry marks and black finger marks on the sliding glass door indicating it had been tampered with. An ice chest cooler had been turned on its side and pushed next to the patio fence at the rear of the enclosed patio area. Across from the cooler, adjacent to the other side of the fence, stood a garbage can, which was some distance from the area in which it normally was stored. There was a drag mark in the dirt easement area outside the patio fence.

The investigators concluded that entry to the apartment had been effected through the sliding glass door. They discovered shoe tracks from two distinct pairs of shoes leading from the dirt easement, just outside the fence, approximately twenty feet to the parking area. Although the investigators were unable to determine that the tracks had been made by the shoes later seized from defendant and Gaxiola, they were unable to exclude that possibility.

After speaking with Garza, and within an hour after arriving at the Hernandez apartment, Deputy Williams departed in his patrol vehicle. He soon noticed a green Datsun, model 210, emerging from an alley in the vicinity of the apartment and observed that the vehicle, its license number, and the persons inside corresponded to the information supplied by Garza. When Deputy Williams pulled his vehicle behind the green Datsun, it accelerated and made several turns. After Deputy Williams activated his red

lights, the Datsun pulled into a parking space. As Deputy Williams exited from his vehicle to approach the Datsun, the driver (Gaxiola) suddenly departed on foot. Deputy Williams approached the passenger (defendant) and told him to place his hands behind his back. As the deputy grabbed defendant's left hand, defendant pulled his hand away, pushed the deputy, and ran down the street, with Deputy Williams following on foot. Meanwhile, a citizen pursued and captured Gaxiola. Deputy Williams, having lost sight of defendant, returned and arrested Gaxiola, who told the deputy his name was George Molina.

Deputy Williams subsequently received advice (apparently from Gaxiola) to contact Belia Melendes, with whom defendant lived at an apartment located approximately eight blocks from Mount Vernon Street. After obtaining Melendes's permission to search the apartment, Williams discovered defendant hiding in the attic space, wrapped in a sheet. After being advised of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), defendant agreed to speak to Deputy Williams and told him his name was Tony Cruz and that he had not been at Hernandez's apartment.

Later that same day, while incarcerated, Gaxiola made a number of telephone calls to Salcido as well as to Candolita and Hernandez at the latter's residence. Initially, he denied involvement in the burglary, claiming he simply had accompanied friends who said they were moving property belonging to an aunt, and disclaimed knowledge that the apartment was Hernandez's residence. In subsequent telephone calls, however, Gaxiola provided specific information as to the location of most of the property and offered to replace the Nintendo game. Through the information supplied by Gaxiola, officers located the television set and the videocassette recorder at an apartment on Larcus Street. The residents of that apartment informed the officers they had purchased the property for $200 from two Hispanic men who had come to their door offering to sell the items. The officers also seized another television and videocassette recorder that the residents stated they previously had purchased from the same two men.

The defense presented the following evidence to the jury. Gaxiola, a heroin user who admitted having suffered three prior convictions for burglary in 1980, 1982, and 1987, and a conviction for receiving stolen property in 1986, testified he had been acquainted with defendant since August 1990. During the period Gaxiola was involved with Salcido, the two of them had visited Hernandez's apartment on several occasions between the latter part of 1989 and the summer of 1990, and Gaxiola also had visited Hernandez's boyfriend, Jay, several times at the apartment. On one occasion, while Jay

was taking a shower, Gaxiola removed a key to the apartment from a table, had a duplicate made, and returned the key without being detected.

At approximately 10 a.m. on September 27, 1990, Gaxiola appeared at defendant's apartment and told him Gaxiola needed help in retrieving his property from his girlfriend's residence. Gaxiola drove with defendant in a borrowed vehicle to the area behind Hernandez's residence, where defendant accompanied Gaxiola to the front door. Gaxiola unlocked the dead bolt lock and instructed defendant to return to the vehicle and lower the rear seat in order to make more space for the items to be transported. Finding no one home, Gaxiola entered alone through the front door of Hernandez's apartment. He carried the television set out the front door along the walkway to the Datsun, placed it on the ground, returned with the videocassette recorder and other items, and was preparing to load the television set into the Datsun when he was approached and questioned by Perez. Gaxiola then reentered the apartment, opened the sliding glass door at the rear of the apartment, called to defendant, and handed him a sandwich over the back fence. Upon hearing someone knocking at the front door, Gaxiola left through the sliding glass door leading to the patio, scaling the back fence after tossing a Nintendo game and a bag of other items over the fence. According to Gaxiola, defendant did not assist Gaxiola, was unaware Gaxiola was committing a burglary, and was not acting as a "lookout."

Gaxiola told defendant that the articles belonged to him and that he wished to sell them. The two men proceeded to the apartment on Larcus Street where, with defendant's assistance as a Spanish interpreter, Gaxiola sold the property. Gaxiola did not share any of the proceeds of the sale with defendant.

Defendant testified in his own behalf, admitting three prior convictions for forgery. At the time of the burglary, he had known Gaxiola approximately one month and did not know where Gaxiola lived. Although Gaxiola never had "fixed" at defendant's residence, Gaxiola had mentioned heroin on several occasions. Several days prior to the date of the burglary, Gaxiola had driven defendant (who never had driven the Datsun because he did not know how to operate a manual transmission) to an apartment (not Hernandez's), telling defendant he was picking up property at a friend's residence. They subsequently transported the items obtained by Gaxiola (a videocassette recorder, a microwave, and a television set) to an apartment on Larcus Street, where, with defendant acting as a Spanish interpreter, Gaxiola sold the items to the occupants. Defendant did not know Gaxiola was selling stolen property. Defendant did not consider it unusual that Gaxiola collected property from one location and sold it elsewhere, because Gaxiola knew a great number of persons.

On the morning of September 26, 1990, Gaxiola woke defendant, telling him that Gaxiola's girlfriend had "run him out" and that Gaxiola had to remove some of his belongings from her apartment or she would be angry. Gaxiola drove with defendant in the Datsun to an apartment defendant previously had not visited. Accompanied by defendant, Gaxiola proceeded to the front door and unlocked and opened it. Defendant did not enter the apartment. Gaxiola appeared pleased to find no one home and instructed defendant to return to the Datsun and lower the rear seat. Defendant testified he was unaware Gaxiola was committing a burglary, because Gaxiola had a key and had told defendant he was picking up his own belongings, which defendant assumed to be a reference to clothing.

After defendant returned to the vehicle and lowered the rear seat, Gaxiola appeared, carrying a television set, which he placed near the Datsun. While defendant waited, he smoked a cigarette and began to read a map. At one point, Gaxiola called to him from inside the apartment and offered him a sandwich, which Gaxiola handed to him over the back fence. Defendant asked Gaxiola to "hurry up" and walked back to the vehicle. Gaxiola returned with a sack and a Nintendo game. Defendant was aware Gaxiola left the premises "through the back," although he did not observe Gaxiola climb over the fence. A woman (presumably Perez) then approached and spoke with Gaxiola, but defendant did not hear their conversation. When she departed, Gaxiola placed the television set inside the vehicle and drove off with defendant.

Gaxiola proceeded to the same apartment on Larcus Street where they had sold other items several days previously. Defendant acted as a Spanish interpreter while Gaxiola sold items taken from Hernandez's apartment, but defendant did not receive any proceeds of the sale. Gaxiola returned defendant briefly to his apartment, but they subsequently drove around until apprehended by Deputy Williams. Defendant attempted to escape and furnished a false name at the time he was apprehended, because he was on parole and already had violated the terms of his parole by failing to report his current address.

The trial court instructed the jury as to the elements of burglary and as to liability on a theory of aiding and abetting. Defendant did not request, and the trial court did not provide, any instruction informing the jury as to what point in time defendant must have formed the intent to commit, encourage, or facilitate the offense of burglary in order to be found guilty on a theory of

aiding and abetting. The jury found defendant guilty of burglary of an inhabited dwelling, in violation of section 460, former subdivision 1.[3]

On appeal, defendant contended the trial court erred in failing to instruct sua sponte that, in order to be found guilty on a theory of aiding and abetting, defendant must have formed the requisite intent prior to or at the time of an entry by Gaxiola into the residence.[4] The Court of Appeal determined that the facts and circumstances of the present case were sufficiently distinguishable from those of earlier cases in which trial courts were held to have had a sua sponte duty to so instruct. The appellate court also held that an instruction relating to when defendant formed the requisite intent as an aider and abettor would have been inconsistent with defendant's theory that, even at the time the property was sold, he remained unaware Gaxiola had committed a burglary, and that such an instruction thus would have invited the jury to question defendant's veracity in presenting this defense. Affirming the judgment of conviction, the court therefore held that the trial court was under no obligation to provide this instruction sua sponte. We granted defendant's petition for review.

II

The prosecution offered two theories upon which defendant could be convicted of burglary, asserting that defendant either personally entered the residence with Gaxiola in order to commit a theft, or aided and abetted Gaxiola in the latter's commission of the offense. Before deciding whether, in light of the evidence presented at trial, the trial court erred in failing to instruct the jury sua sponte that an aider and abettor, prior to or at the time of an entry by the perpetrator, must have formed the intent to commit, encourage, or facilitate the commission of the offense, we first must determine the duration of the offense of burglary for purposes of the liability of an aider and abettor, because the intent of an aider and abettor must be formed before or as the offense is being committed.[5]

■ Because section 31 defines as principals all who directly commit a given offense or who aid and abet *in its commission*, the same criminal

---

[3]Defendant subsequently admitted the three allegations of prior convictions with service of prison terms and was sentenced to the upper term of six years on the burglary and to a consecutive one-year term for one of the prior conviction allegations (the court staying the terms on the two remaining allegations).

[4]Such an instruction is embodied in CALJIC No. 14.54 (1989 new) (5th ed. pocket pt.), providing that, "In order for an accused to be guilty of burglary as an aider and abettor, [he] [she] must have formed the intent to encourage or facilitate the perpetrator prior to the time [that person] [ ] made the entry into the [inhabited dwelling] with the required specific intent."

[5]In his petition for review, defendant raised the issue whether the trial court was required to instruct sua sponte that the intent of an aider and abettor must be formed prior to, or at the time of, an *entry* into the building by the perpetrator. Subsequently, we requested that the

liability attaches whether a defendant directly perpetrates the offense or aids and abets the perpetrator. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 554-555 [199 Cal.Rptr. 60, 674 P.2d 1318]; *People* v. *Brady* (1987) 190 Cal.App.3d 124, 132-133 [235 Cal.Rptr. 248].)[6] The doctrine in *Beeman* that one may be liable when he or she aids the perpetrator of an offense, knowing of the perpetrator's unlawful purpose and intending, by his or her act of aid, to commit, encourage, or facilitate commission of the offense, "snares all who intentionally contribute to the accomplishment of a crime in the net of criminal liability defined by the crime, even though the actor does not personally engage in all of the elements of the crime." (*People* v. *Brady*, *supra*, 190 Cal.App.3d 124, 132.) Because the aider and abettor is subject to the same criminal liability and the same potential punishment as the perpetrator, it is essential to distinguish the act and intent that constitute "aiding and abetting" the commission of a crime, from conduct that will incur the lesser liability of an "accessory" to the crime—defined as conduct by one who, "*after a felony has been committed,* . . . aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony . . . ." (§ 32, italics added.)[7]

It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator "must be formed *prior to or during* 'commission' of that offense." (*People* v. *Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742], italics in the original; see *People* v. *Beeman*, *supra*, 35 Cal.3d 547, 556-558.) Although the parties agree with this statement of the generally applicable legal principle, they disagree on the question of the *duration* of the offense of burglary for the purpose of establishing liability as an aider and abettor.

Defendant relies upon a line of Court of Appeal decisions that have concluded that, because the crime of burglary is complete (that is, all of the

parties provide supplemental briefing on the threshold issue of the duration of burglary for the purpose of determining the liability of an aider and abettor.

[6]Section 31 provides: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." The jury was so instructed in the present case. (CALJIC No. 3.00 (5th ed. 1988 bound vol.).)

[7]"[I]n accord[] with the clear trend, the accessory after the fact is no longer treated as a party to the underlying felony, as at common law. This kind of accessory is coming to be recognized for what he is: an 'obstructer' of justice, the author of a separate and independent offense." (1 Wharton's Criminal Law (15th ed. 1993) Parties, § 35, p. 210, fn. omitted; see *People* v. *Balderas* (1985) 41 Cal.3d 144, 193-194, & fn. 22 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].)

elements of the offense have been satisfied) upon the perpetrator's entry into the structure with felonious intent, a person may be found guilty as an aider and abettor only if he or she formed the requisite intent to commit, encourage, or facilitate the offense *prior to or during entry by the perpetrator.* (See *People* v. *Macedo* (1989) 213 Cal.App.3d 554, 558 [261 Cal.Rptr. 754]; *People* v. *Forte* (1988) 204 Cal.App.3d 1317, 1321-1322 [251 Cal.Rptr. 855]; *People* v. *Brady, supra,* 190 Cal.App.3d 124, 133-134, 137; *People* v. *Markus* (1978) 82 Cal.App.3d 477, 481-482 [147 Cal.Rptr. 151].)

The People maintain that the reasoning of these decisions is inconsistent with the analysis contained in this court's decision in *People* v. *Cooper, supra,* 53 Cal.3d 1158, and suggest that, under the *Cooper* analysis, the commission of a burglary does not terminate, for the purpose of aiding and abetting, upon the perpetrator's entry into the structure, but rather continues until the perpetrator's departure from the structure. As we explain, we conclude that our recent decision in *Cooper* supports the People's position. Accordingly, we disapprove these Court of Appeal decisions to the extent they conflict with our conclusion, explained below.

In *People* v. *Cooper, supra,* 53 Cal.3d 1158, the issue of aiding and abetting arose in the context of a robbery. The defendant in *Cooper,* the driver of the getaway vehicle, contended he was unaware of the perpetrators' intent to commit the robbery until after the perpetrators already had taken the property from the immediate presence of the victim by force. The defendant asserted that, because he formed the intent to assist only after that occurrence, he could not properly be found guilty as an aider and abettor and his liability was limited to that of an accessory after the fact.

In *Cooper,* we rejected the defendant's contention, concluding that the temporal threshold for establishing guilt—a fixed point in time at which all elements of the substantive offense are satisfied so that the offense itself may be considered to have been "*initially* committed" rather than simply attempted—is *not* synonymous with the "commission" of that crime for the purpose of determining aider and abettor liability. (53 Cal.3d 1158, 1164, italics in the original.) We explained that in determining the duration of an offense, for the purpose of aider and abettor liability, the court must take into account the nature of the interests that the penal provision is intended to protect, emphasizing in this regard that both the victim of a crime and a potential aider and abettor frequently will not perceive an offense as "completed" simply because all elements necessary to establish guilt already have been satisfied. To illustrate this point we referred to the crime of rape, observing that "[t]he rape victim . . . would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial

penetration)", but rather would consider the offense not to have ended "until all of the acts that constitute the rape have *ceased*." (*Id.* at pp. 1164-1165, fn. 7.) We also noted that "the unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts" reasonably would be found to have formed the intent to facilitate the rape during the commission of the rape. (*Id.* at p. 1165, fn. 7.)

Applying this analysis to the crime of robbery, we determined in *Cooper* that the crime of robbery is not completed, for aiding and abetting purposes, at the point in time at which the perpetrator has committed sufficient acts to satisfy all the elements of robbery. Instead, relying upon the circumstance that asportation (carrying away) of the stolen property is a distinct element of the crime of robbery, we concluded that, for the purpose of aiding and abetting, the duration of a robbery extends to the carrying away of the stolen property to a place of temporary safety. We held in this regard that "for conviction of the more serious offense of aiding and abetting a robbery, a getaway driver must form the intent to facilitate or encourage commission of the robbery prior to or during the carrying away of the loot to a place of temporary safety." (53 Cal.3d at p. 1165, fn. & italics omitted.)

In the course of our discussion in *Cooper*, we noted that the crime of burglary, unlike robbery, does not include asportation as one of its elements, and thus, for the purpose of aiding and abetting, liability for burglary would *not* extend to a person who simply aided a burglar in the asportation of the stolen property after its removal from the burgled structure. (See 53 Cal.3d at p. 1169 & fn. 13.) In *Cooper*, however, we had no occasion to decide at precisely what point—the perpetrator's entry into the structure, his or her departure from the structure, or some other point—the acts constituting the crime of burglary terminate for the purpose of aiding and abetting. That question is now before us, and in resolving it we turn to the general analysis contained in our *Cooper* decision, also considering the nature of the elements of the crime of burglary and the specific interests that the law seeks to protect in defining this offense.

■ The crime of burglary consists of an act—unlawful entry—accompanied by the "intent to commit grand or petit larceny or any felony." (§ 459.)[8] One may by liable for burglary upon entry with the requisite intent to commit a felony or a theft (whether felony or misdemeanor), regardless of

---

[8]Although in the typical case, the intent of the burglar is to commit theft (whether felony or misdemeanor), the relevant statute provides, and the decisional law establishes, that the intent to commit *any* felony will sustain a conviction of burglary. (§ 459; see, e.g., *People* v. *Hicks* (1993) 6 Cal.4th 784, 787-788 [25 Cal.Rptr.2d 469, 863 P.2d 714] [intent to commit rape, sodomy and penetration by foreign object]; *People* v. *Goldsworthy* (1900) 130 Cal. 600, 602 [62 P. 1074] [intent to commit arson]; *People* v. *Salemme* (1992) 2 Cal.App.4th 775, 777-778

whether the felony or theft committed is different from that contemplated at the time of entry, or whether any felony or theft actually is committed. (*People* v. *Devlin* (1904) 143 Cal. 128, 129-130 [76 P. 900]; *People* v. *Shaber* (1867) 32 Cal. 36, 38; *People* v. *Ravenscroft* (1988) 198 Cal.App.3d 639, 643 [243 Cal.Rptr. 827]; *People* v. *Morales* (1968) 263 Cal.App.2d 211, 214 [69 Cal.Rptr. 553]; *People* v. *Walters* (1967) 249 Cal.App.2d 547, 550 [57 Cal.Rptr. 484]; *People* v. *Mitchell* (1966) 239 Cal.App.2d 318, 328 [48 Cal.Rptr. 533]; *People* v. *Murphy* (1959) 173 Cal.App.2d 367, 373 [343 P.2d 273]; *People* v. *Novo* (1936) 12 Cal.App.2d 525, 528 [55 P.2d 915]; 2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Property, § 663, p. 746.)

 It does not follow, however, that once the offense itself has been initiated, that is, the perpetrator has entered the structure with the requisite intent, an individual who, with knowledge of the perpetrator's unlawful purpose, thereafter forms the intent to commit, facilitate, or encourage commission of the offense by the perpetrator while the perpetrator still remains inside the structure, is not liable as an aider and abettor.

In *People* v. *Gauze* (1975) 15 Cal.3d 709, 714 [125 Cal.Rptr. 773, 542 P.2d 1365], while observing that a burglary consists of "an entry which invades a possessory right in a building," we had occasion to review the broad underlying basis for the criminal sanction against the particular act and intent constituting burglary. Therein, we quoted the rationale set forth in *People* v. *Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650]: " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' Section 459, in short, is aimed at the danger caused by the unauthorized entry itself." (*People* v. *Gauze, supra*, 15 Cal.3d 709, 715; accord, *People* v. *Brown* (1992) 6 Cal.App.4th 1489, 1496 [8 Cal.Rptr.2d 513]; *People* v. *Thomas* (1991) 235 Cal.App.3d 899, 906 [1 Cal.Rptr.2d 434]; see *People* v. *McCormack* (1991) 234 Cal.App.3d 253, 257 [285 Cal.Rptr. 504]; see *People* v. *O'Keefe* (1990) 222 Cal.App.3d 517, 521 [271 Cal.Rptr. 769]; *People* v. *Hines* (1989) 210 Cal.App.3d 945, 950-951 [259 Cal.Rptr. 128]; *In re William S.* (1989) 208 Cal.App.3d 313,

---

[3 Cal.Rptr.2d 398] [intent to sell fraudulent securities]; *People* v. *Du Bose* (1970) 10 Cal.App.3d 544, 551 [89 Cal.Rptr. 134] [intent to commit robbery]; *People* v. *Schwab* (1955) 136 Cal.App.2d 280, 286 [288 P.2d 627] [intent to commit murder or felonious assault].)

318 [256 Cal.Rptr. 64].) Although entry into an *inhabited* structure is recognized as most dangerous and most likely to create personal injury, justifying assignment of the greater degree (§ 460; see *People* v. *Thomas, supra,* 235 Cal.App.3d 899, 906; *People* v. *Hines, supra,* 210 Cal.App.3d 945, 950-951; *People* v. *Wilson* (1989) 208 Cal.App.3d 611, 615 [256 Cal.Rptr. 422]), some risk of danger to human life and safety exists whether or not the structure is inhabited, because the intrusion may give rise to a confrontation between the intruder and persons lawfully on the premises.

Although the decisions generally have emphasized this aspect of the danger to personal safety created by the offense of burglary, other authority, involving factual circumstances in which actual danger appears not to exist or is relatively minor, and relying upon the purpose of the statute to protect against an invasion of a possessory right, has concluded that the threat to property interests alone, created by the burglar's entry and continued presence inside the structure, supports a finding of burglary. (*People* v. *Salemme, supra,* 2 Cal.App.4th 775, 781-782; *People* v. *Superior Court (Granillo)* (1988) 205 Cal.App.3d 1478, 1485 [253 Cal.Rptr. 316]; *People* v. *Ravenscroft, supra,* 198 Cal.App.3d 639, 643; see *People* v. *Brown, supra,* 6 Cal.App.4th 1489, 1497, fn. 3.)

■ It is manifest that the increased danger to the personal safety of the occupant, and the increased risk of loss or damage to his or her property contemplated by the statutory proscription, do not terminate at the moment entry is accomplished, but rather continue while the perpetrator remains inside the structure. Certainly, an absent occupant could return at any moment and be faced with the danger created by the prior entry. Thus, one who learns that the perpetrator unlawfully has entered with intent to commit a felony or theft, who forms the requisite intent to assist, and who does assist—by independently contributing to the commission of the crime or by otherwise making it more likely that the crime will be successfully completed than would be the case absent such participation (*People* v. *Brady, supra,* 190 Cal.App.3d 124, 132)—logically should be liable as an aider and abettor rather than as a mere accessory.

Moreover, as long as the perpetrator remains inside the structure, the increased danger to the personal safety of the occupant and the increased risk of loss or damage to his or her property continues, whether the perpetrator commits a felony or theft different from that intended at the time of entry, or even if no felony or theft is completed. The appearance and assistance of an aider and abettor, even if belated, contribute to and perpetuate this increased danger and risk. For example, an individual might learn of the perpetrator's earlier entry with the requisite intent, form his own intent to facilitate that

offense, and commence acting as a "lookout" at the point of entry, on behalf of the perpetrator. The presence of the "lookout," by prolonging the perpetrator's presence in the structure, may increase the chance of an encounter between the perpetrator and a returning occupant.

Nor should the liability of an individual for aiding and abetting a perpetrator be negated by the circumstance that the aider and abettor forms the intent to assist in the commission of the offense only after entry by the perpetrator. We understand the concern articulated by the Court of Appeal in *People* v. *Brady, supra,* 190 Cal.App.3d 124, that, because (with some exceptions) no burglary has been comitted by the perpetrator if his or her intent to commit a felony or theft arose *after* entry (*id.* at p. 133; see *People* v. *Lowen* (1894) 109 Cal. 381, 382-384 [42 P. 32]), "[t]he culpability of the assistant to the thief, whose intent to aid does not arise until after the entry of the thief, must be judged by the same rule." (190 Cal.App.3d at p. 134.) Nonetheless, we believe that this comment does not fully recognize the significance of the distinct mens rea requirements for burglary and for aiding and abetting.

In *People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392], we discussed the nature of the intent required to establish liability as an aider and abettor. Noting that " ' "[o]ne may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it," ' " and that an aider and abettor may be liable not only for a crime that, to one's knowledge, one's colleagues are contemplating committing, but also for the natural and reasonable consequences of any act that one knowingly aided or encouraged, we stated: "It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury. (*People* v. *Beeman, supra,* 35 Cal.3d 547, 556.)" (41 Cal.3d at p. 12, fn. 5; see *People* v. *Brady, supra,* 190 Cal.App.3d 124, 136, and *People* v. *Forte, supra,* 204 Cal.App.3d 1317, 1323, fn. 3 [aider and abettor need not share intent to steal but may intend merely to facilitate commission of offense, whether or not sharing in its fruits].)

 Therefore, if an individual happens upon a scene in which a perpetrator unlawfully has entered with intent to commit a felony or theft, and,

upon learning of that circumstance, forms the intent to facilitate the perpetrator's illegal purpose in entering, that individual incurs the liability of an aider and abettor, commensurate with the liability of the perpetrator.

■ This conclusion in turn compels the analogous conclusion that an aider and abettor is not liable for burglary (just as the perpetrator is not liable) where the perpetrator formed the intent to commit a felony or theft only following the entry. Contrary to the suggestion in *People* v. *Brady, supra,* 190 Cal.App.3d 124, it is *this* result that "preserves the symmetry of culpability of the aider and abettor" (*id.* at p. 134) with that of the perpetrator.

■ ■ Our determination that, for the purpose of assessing the liability of an aider and abettor, a burglary is considered ongoing during the time the perpetrator remains inside the structure finds additional support in the analysis of sexual offenses, which, because of their similar element of unwanted personal invasion, may be analogized to the invasive act comprising a burglary. (See *People* v. *Escobar* (1992) 7 Cal.App.4th 1430, 1436-1437 [9 Cal.Rptr.2d 770]; *In re William S., supra,* 208 Cal.App.3d 313, 317.) As noted above, in *People* v. *Cooper, supra,* 53 Cal.3d 1158, we observed that the victim of a rape would not agree the offense was completed simply because all legal elements of the offense were established by the initial forcible penetration. (*Id.* at pp. 1164-1165, fn. 7.) Similarly, one who happens to be at home during a burglary and becomes aware not only of the entry itself, but of the burglar's continued presence, would not agree the offense was completed once the entry was accomplished, but rather would conclude the burglary ceased only when the burglar departed from the structure and the danger was past. One happening to arrive home after the burglar's entry but while he or she still is present in the residence would reach the same conclusion. It also is apparent that, even if the occupant is not present, the risk to property would continue during the entire period the burglar remains in the structure and is not diminished simply because the entry itself has been accomplished.[9]

■ We next apply the above described rule in the context of the present case, in which the perpetrator made several entries and exits of the burgled

---

[9]Although the Attorney General has not contended otherwise, we observe, in accordance with our analysis in *People* v. *Cooper, supra,* 53 Cal.3d 1158, that the *duration* of the offense of burglary, as defined for the purpose of assigning aider and abettor liability, need not and should not be identical to the definition pertinent to felony-murder liability or to other "ancillary consequences" of burglary. (*Id.* at pp. 1166-1169; see *People* v. *Brady, supra,* 190 Cal.App.3d 124, 134; cf. *People* v. *Ramirez* (1979) 93 Cal.App.3d 714, 726 [156 Cal Rptr. 94]; *People* v. *Fuller* (1978) 86 Cal.App.3d 618, 622-628 [150 Cal.Rptr. 515] [burglars' liability for felony murder continues through escape until perpetrator reaches place of temporary safety].) Accordingly, the liability of an aider and abettor to burglary may not be based upon an intent to commit, encourage, or facilitate the commission of the offense, when such intent arises after the perpetrator has departed from the structure.

We also note that this case presents the issue of an aider and abettor's liability only for

dwelling during the couse of a single burglary.[10] We conclude that in such a case, the aider and abettor may be liable if he or she, with knowledge of the perpetrator's unlawful purpose, forms the intent to commit, encourage or facilitate commision of the offense at any time prior to the perpetrator's final departure from the structure.

Our reasoning is consistent with that of the Court of Appeal in *People* v. *Escobar, supra,* 7 Cal.App.4th 1430, a burglary case involving multiple entries. The defendant in *Escobar* contended that, because all of the elements of the burglary were completed at the time of the perpetrator's *initial* entry into the residence, the defendant could be convicted as an aider and abettor only if his knowledge and intent arose before that initial entry, and not if it arose after that entry but prior to one of the perpetrator's subsequent entries. The court in *Escobar,* relying heavily upon this court's then-recent decision in *Cooper* (7 Cal.App.4th at pp. 1436-1437), rejected the defendant's contention, explaining that "it does not follow that the perpetrator's felonious intent has evaporated or ceased simply because the crime is technically complete; instead, that same intent obviously continues during the subsequent entries. The individual who happens on the scene after the initial entry, becomes aware of the perpetrator's unlawful purpose, and intentionally assists during the subsequent entries, aids and encourages commission of the offense as surely as if that individual's knowledge had preceded the perpetrator's initial entry." (7 Cal.App.4th at p. 1437.) Because under the facts of *Escobar* the aider and abettor clearly had formed the requisite intent prior to at least one of the perpetrator's subsequent entries, the court in *Escobar* had no occasion to determine whether its analysis also would apply to a person who formed the requisite intent to facilitate the crime after the perpetrator's final entry into the residence but while the perpetrator still was inside that structure. Nonetheless, in view of our conclusion above that the duration of

---

burglary. We express no opinion on the issue of an aider and abettor's liability for murder upon a theory of felony murder in which the underlying felony is burglary.

[10]In the present case, defendants were charged with and convicted of a single burglary, and the evidence demonstrates that the multiple entries were "committed pursuant to one intention, one general impulse, and one plan." (*People* v. *Bailey* (1961) 55 Cal.2d 514, 519 [11 Cal.Rptr. 543, 360 P.2d 39]; see *In re William S., supra,* 208 Cal.App.3d 313, 316-318.) Accordingly, we need not concern ourselves with whether multiple burglaries properly could have been alleged or proved. (Cf. *In re William S., supra,* 208 Cal.App.3d 313, 315-318 [upholding separate convictions for second entry into burglarized residence several hours after first entry]; *People* v. *Harrison* (1989) 48 Cal.3d 321, 327-334 [256 Cal.Rptr. 401, 768 P.2d 1078] [separate convictions for consecutive sexual penetrations with foreign object upheld]; *People* v. *Marks* (1986) 184 Cal.App.3d 458, 464-467 & fn. 8 [229 Cal.Rptr. 107] [separate convictions for consecutive acts of sodomy upheld]; *People* v. *Clem* (1980) 104 Cal.App.3d 337, 346-347 [163 Cal.Rptr. 553] [separate convictions for consecutive rapes affirmed]; see 1 Witkin & Epstein, Cal. Criminal Law, *supra,* Elements of Crime, §§ 118-119, pp. 138-140.)

a burglary, for the purpose of aider and abettor liability, extends until the perpetrator's departure from the structure, *Escobar*'s analysis correctly suggests that where, as here, the perpetrator makes multiple entries within a brief period, an individual who, with knowledge of the unlawful purpose of the perpetrator, forms the intent to commit, encourage, or facilitate the commission of the offense prior to the perpetrator's final departure from the structure, may be liable as an aider and abettor.

## III

■■ ■■ Having concluded that the intent of an aider and abettor need not be formed prior to final entry by the perpetrator, and, therefore, that CALJIC No. 14.54 as presently drafted is an incorrect statement of the law and should not be given in any case, we now determine whether, in light of the conclusion we have reached as to the duration of burglary for purposes of aider and abettor liability, the trial court adequately instructed the jury on the issue of aiding and abetting. ■■ It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1]; *People v. Perez* (1992) 2 Cal.4th 1117, 1129 [9 Cal.Rptr.2d 577, 831 P.2d 1159]; *People v. Daniels* (1991) 52 Cal.3d 815, 885 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Guzman* (1988) 45 Cal.3d 915, 962 [248 Cal.Rptr. 467, 755 P.2d 917]; *People v. Kimble* (1988) 44 Cal.3d 480, 503 [244 Cal.Rptr. 148, 749 P.2d 803]; *People v. Edwards* (1985) 39 Cal.3d 107, 117 [216 Cal.Rptr. 397, 702 P.2d 555]; *People v. Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]; 5 Witkin & Epstein, Cal. Criminal Law, *supra*, Trial, § 2924, pp. 3584-3586.) The trial court is charged with instructing upon every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. (*People v. Flannel, supra*, 25 Cal.3d 668, 684-685; *People v. Sedeno, supra*, 10 Cal.3d 703, 716.)

■■ In the present case, in addition to instructing the jury pursuant to CALJIC No. 3.01 (aider and abettor is one who, with requisite knowledge and intent, facilitates commission of the offense)[11] and CALJIC No. 3.14 (aider and abettor's mere assistance without knowledge of perpetrator's

[11]As given in the present case, the instruction, based upon CALJIC No. 3.01 (5th ed. 1988 bound vol.), provided: "A person aids and abets the commission of a crime when he or she,

unlawful purpose is not criminal),[12] the trial court instructed the jury pursuant to CALJIC No. 14.50 (defining the offense of burglary)[13] and in the language of CALJIC No. 3.31 (requirement of concurrence of act and specific intent).[14] As noted, defendant did not request any specific instruction with regard to the time the intent to facilitate or encourage the commission of the offense must have been formed in order to support a finding of guilt on a theory of aiding and abetting. In light of the manner in which the case was tried and argued by the parties, we conclude that the question of the precise time at which the requisite intent of an aider and abettor must have been formed was not an issue that was so "closely and openly" connected to the facts before the court as to give rise to a sua sponte duty to instruct on the part of the trial court, and that the instructions furnished by the trial court were adequate.

The prosecution's case-in-chief supported the theory that defendant was aware of Gaxiola's intent to commit a burglary and formed the intent to assist him in that enterprise prior to its commencement. There is scant evidence to suggest it was only after Gaxiola's departure that defendant belatedly learned a burglary was being committed. Although defendant testified he had assumed that by referring to his "stuff," Gaxiola intended to remove his own clothing from the residence, in fact Gaxiola removed a

[¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice aids, promotes, encourages or instigates the commission of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

[12]The version of CALJIC No. 3.14 (1979 rev.) upon which the instructions given in the present case were based provided: "Merely assenting to or aiding or assisting in the commission of a crime without knowledge of the unlawful purpose of the perpetrator is not criminal, and a person so assenting to, or aiding, or assisting in, the commission of a crime without such knowledge is not an accomplice in the commission of such crime."

[13]As given in the present case, the instruction, based upon CALJIC No. 14.50 (5th ed. 1988 bound vol.), provided: "Defendant is accused in the information, of having committed the crime of burglary, a violation of Section 459 of the Penal Code. [¶] Every person who enters any dwelling house, with the specific intent to steal, take and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of such property is guilty of the crime of burglary in violation of Penal Code, Section 459. [¶] It is immaterial whether the intent with which the entry was made was thereafter carried out. [¶] In order to prove such crime, each of the following elements must be proved: [¶] 1. A person entered a dwelling house. [¶] 2. At the time of the entry, such person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of such property."

[14]As given in the present case, the instruction, based upon CALJIC No. 3.31 (1989 rev.), provided: "In the crime charged in the information, namely, burglary, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime to which it relates is not committed. [¶] The specific intent required is included in the definition of the crime charged."

television set and a videocassette recorder, items similar to those that defendant knew Gaxiola had retrieved from another address and had sold only several days earlier. Although defendant testified he believed Gaxiola was authorized to enter the apartment because he possessed a key, defendant was aware that Gaxiola left the premises "through the back" (even though defendant testified he did not see Gaxiola climb the back fence.) In addition, defendant was nearby when Gaxiola told Perez they were retrieving the belongings of his cousin.

Nor did the prosecutor's argument promote the theory that defendant formed the intent to facilitate the burglary at some point after Gaxiola's departure. (See *People* v. *Brown* (1988) 45 Cal.3d 1247, 1256 [248 Cal.Rptr. 817, 756 P.2d 204] [evaluation of arguments of counsel appropriate where the issue is whether the interplay of argument with individually proper instructions produced a distorted meaning].) Although the prosecutor emphasized the circumstance that defendant was nearby when Gaxiola told Perez they were retrieving the belongings of his cousin, and that defendant at one point admonished Gaxiola to "hurry up," the prosecutor did so to illustrate his point that defendant was aware of and intended to assist in the ongoing burglary (contrary to the defense testimony); the prosecutor did not suggest that such circumstances established that defendant became aware of the criminal enterprise after Gaxiola's departure, even if he did not know of it at the outset.

In contrast to the prosecutor's position that defendant was aware of the intended burglary from the outset, the principal theory presented by the defense was that defendant was unaware of the burglary not only during its commission, but even afterward, when he and Gaxiola sold the stolen property. Both Gaxiola and defendant testified defendant was unaware Gaxiola intended to, and did, commit a burglary. They testified specifically that Gaxiola had told defendant that Gaxiola was retrieving his own belongings from the apartment. Defendant expressly denied having heard the exchange between Gaxiola and Perez in which Gaxiola made the inconsistent statement that the property belonged to his cousin. Defendant further explained he had told Gaxiola to "hurry up" because he had not informed his girlfriend, Melendes, where he was going when they left his apartment that morning. Additionally, Gaxiola testified defendant "never" knew about the burglary, and defendant testified he "never" knew Gaxiola had stolen anything from the dwelling. Gaxiola testified he told defendant, prior to their sale of the items, that Gaxiola owned the property, and he did not share the proceeds with defendant. Defendant asserted he believed at the time that the property belonged to Gaxiola and did not consider it unusual that the two of them returned to sell the property at the same apartment where they had sold items

serveral days previously; defendant did not find this suspicious because Gaxiola knew a large number of persons.

Finally, the argument of defense counsel did not emphasize any interpretation of the evidence other that the foregoing. Defense counsel argued that defendant was unaware a crime was being committed, also asserting that even if defendant had known that a crime was being committed, mere knowledge, in the absence of acts in assistance, was insufficient to establish defendant's liability as an aider and abettor. Defense counsel did not argue that defendant formed the intent to facilitate the offense only after Gaxiola departed from the dwelling.

In view of the evidence presented and the arguments advanced by the parties, the significance of the precise time at which defendant must have formed the requisite intent in order to be liable as an aider and abettor was not an issue "closely and openly" connected with the case. As we have seen, the prosecution's evidence suggested that defendant knowingly intended from the outset to assist in the commission of the burglary, whereas defendant maintained primarily that he was unaware of the burglary throughout the incident and never intended to facilitate its commission. Under these circumstances, the trial court was under no obligation to sift through the evidence to identify an issue that conceivably could have been, but was not, raised by the parties, and to instruct the jury, sua sponte, on that issue. (See, e.g., *People* v. *Wade* (1959) 53 Cal.2d 322, 334-335 [1 Cal.Rptr. 683, 348 P.2d 116] ["[T]he trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts. [¶] . . . [¶] . . . [The defendant's] theory . . . was not one that the evidence would strongly illuminate and place before the trial court. On the contrary, it was so far under the surface of the facts and theories apparently involved as to remain hidden from even the defendant until the case reached this court on appeal. The trial court need not, therefore, have recognized it and instructed the jury in accordance with it. Omniscience is not required of our trial courts."].) The instructions given the jury were adequate in light of the evidence presented, and the trial court was under no obligation further to instruct the jury, sua sponte.

## IV

We conclude that a person who, with the requisite knowledge and intent, aids the perpetrator, may be found liable on a theory of aiding and abetting if he or she formed the intent to commit, encourage, or facilitate the

commission of a burglary prior to the time the perpetrator finally departed from the structure. We also conclude that, in light of the record in the present case, the trial court had no duty, absent a specific request by defendant, to instruct the jury with regard to the point in time by which an aider or abettor must have formed the requisite intent. Accordingly, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and Lillie, J.,* concurred.

**MOSK, J.,** Concurring and Dissenting.—I dissent from part II of the majority opinion. The majority, in apparent fervor to expand the scope of aider and abettor liability, revise by judicial decree the centuries-old definition of the crime of burglary. Such innovation is warranted neither by statute nor precedent. The conclusion that an aider and abettor to a burglary must form his burglarious intent prior to the perpetrator's entry is a corollary of the axiomatic principle that the *perpetrator* of a burglary must possess the requisite pre-entry intent.

Current CALJIC No. 14.54, which provides that one convicted of aiding and abetting a burglary "must have formed the intent to encourage or facilitate the perpetrator prior to the time [that person] [] made the entry into the [structure] with the required specific intent" therefore correctly states the law, and the majority are wrong to discard it.

Nonetheless, I join the majority in affirming defendant's conviction because I agree that the trial court had no sua sponte duty to give a CALJIC No. 14.54 instruction in this case.

I.

"Every person who enters any house [or other defined structure] . . . with the intent to commit grand or petit larceny or any felony is guilty of burglary." (Pen. Code, § 459.) As this court declared more than 100 years ago, the crime of burglary is complete once a perpetrator has entered a structure with felonious or larcenous intent. "The . . . entry and the intent being found or given, the crime would be complete even though it should turn out that, contrary to the calculations of the burglar, the building was empty. The sting of the crime is, in short, the guilty purpose, without reference to the possibility of accomplishing it . . . ." (*People v. Shaber* (1867) 32 Cal. 36, 38.) The principle that burglary is complete after entry with intent to commit a felony or theft is still the law in California. (*People*

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Seven, assigned by the Acting Chairperson of the Judicial Council.

v. *Brady* (1987) 190 Cal.App.3d 124, 133 [235 Cal.Rptr. 248]; *People* v. *Clifton* (1957) 148 Cal.App.2d 276, 279 [306 P.2d 545].) Conversely, as we stated in *People* v. *Hill* (1967) 67 Cal.2d 105, 119 [60 Cal.Rptr. 234, 429 P.2d 586], a "burglary cannot be committed unless . . . specific intent exists at the time of entry and . . . the jury should be so instructed . . . ." From this it follows that even when someone "breaks into the dwelling house of another . . . , but without burglarious intent, [he] is not guilty of burglary even if he actually commits a felony while therein." (Perkins & Boyce, Criminal Law (3d ed. 1982) p. 933.)

To state that the crime of burglary is finished at the point of entry is not to assert the counterintuitive proposition that criminal activity has ceased at that point, but merely to recognize that the burglary has terminated, and the felony or theft that motivates the burglar commences or continues. Although common usage might refer to a "burglary in progress" once the burglar has entered a dwelling, the statutory law considers the crime of entry with felonious or larcenous intent—i.e., the burglary—as distinct from the actual felony or larceny intended. Similarly, the law differentiates between the criminal who forms his felonious or larcenous intent before entry into a dwelling and the one who forms a postentry criminal intent, and for good reason: one who enters a dwelling with felonious or larcenous intent possesses a different culpability, and poses a different kind of threat to society, than the innocent entrant who subsequently conceives a criminal purpose.

An aider and abettor to a specific intent crime must share the specific intent of the perpetrator. (*People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*Ibid.*) An aider and abettor to a burglary must therefore have a specific intent to assist the perpetrator in gaining unconsented entry into a dwelling or other defined structure to enable the perpetrator to commit larceny or a felony.

It follows from these elementary principles that one who did not intend to aid the perpetrator at the point of the perpetrator's entry into the structure did not aid and abet a burglary, since that person did not have the requisite intent at the time the burglary occurred. Rather, one who forms the intent to assist the burglar's larcenous or felonious activity after the burglar's entry would be guilty of aiding and abetting that larceny or felony, but not the burglary. Like the similarly situated perpetrator accused of burglary, the aider and abettor innocent of assisting the burglar's entry is guilty of a different kind of offense than one who assisted that entry with the requisite intent.

The majority rely on *People* v. *Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742] in their effort to redraw the traditional boundaries of the crime of burglary. Although I continue to disagree with this court's decision in *Cooper,* it is nonetheless plainly distinguishable from the present case. *Cooper* involved a determination of the duration of the crime of robbery for aider and abettor purposes. This court decided that, since asportation of stolen goods is one of the statutory elements of robbery, a defendant who did not participate in taking possession of the victim's property but did assist in the asportation of the property by driving the getaway car was guilty as an aider and abettor, rather than as an accessory after the fact. *Cooper* analyzed the duration of the crime in terms of the crime's elements. (*Id.* at p. 1165.) The only controversy in *Cooper* was over the point at which the act of asportation ceased. The majority held that asportation was finished only after the robbers carried the loot to a temporary place of safety. (*Ibid.*) The dissent, on the other hand, argued that "only slight asportation is necessary to make the crime of robbery complete." (*Id.* at p. 1174, dis. opn. of Kennard, J.) The *Cooper* majority's analysis nonetheless proceeded from its assessment of the duration of the criminal acts that are the statutory elements of the crime in question.

In this case, the elements of a burglary are, as discussed above, entry into a house or other defined structure with intent to commit larceny or a felony. Unlike the case of asportation of stolen goods, in which the word "asportation" could be understood to mean an act occurring over a period of time, the duration of the "entry" element in a burglary is confined by definition to the fixed point at which entry occurs. Thus this case departs from *Cooper* in that its analysis of the duration of the crime for aider and abettor purposes is no longer tied to a determination of the length of time of the acts that constitute the elements of the crime; the majority assert instead that the crime somehow continues after performance of all the elements of the crime have ceased.

In order to arrive at their conclusion, the majority resort to a facile comparison to the crime of rape, drawn from a footnote in the *Cooper* opinion. " '[T]he rape victim . . . would not agree that the crime was completed once the crime was initially committed (i.e., at the point of initial penetration)', but rather would consider the offense not to have ended 'until all of the acts that constitute the rape have *ceased.*' . . . '[T]he unknowing defendant who happens on the scene of a rape after the rape has been initially *committed* and aids the perpetrator in the continuing criminal acts' reasonably would be found to have formed the intent to facilitate the rape during the commission of the rape." (Maj. opn., *ante,* at pp. 1040-1041, quoting *Cooper, supra,* 53 Cal.3d at pp. 1164-1165, fn. 7.)

Yet the duration of aider and abettor liability for rape and burglary are clearly different matters. The crime of rape consists of an act of sexual intercourse that is nonconsensual. (Pen. Code, § 261.) Although the act of penetration, however slight, is sufficient to complete the crime of rape (Pen. Code, § 263), it is evident that the crime of rape continues for as long as the unlawful sexual intercourse persists. It is sexual intercourse, not penetration, that is the essential act of a rape. The reference in section 263 to "any sexual penetration, however slight" is intended not to define the entirety of such intercourse, much less to fix the duration of the crime of rape, but merely to define what is *minimally* required to establish the act element of a rape.

Burglary, on the other hand, is defined *in terms of* entry. Nonconsensual entry with felonious or larcenous intent is not the minimum one must perform for a burglary, it is the definition of burglary itself. Again, although there are act elements of the crimes of robbery and rape—asportation and sexual intercourse respectively—that may be performed over an extended period of time, leading to a disjunction between the "threshold of guilt-establishment" of the crime and the complete "commission" of the crime (*People* v. *Cooper, supra,* 53 Cal.3d at p. 1164), that is not the case with burglary. Because the act element of the burglary—entry into a dwelling—occurs at a fixed point in time, the point at which a burglar's culpability for burglary is established is also, in most cases, the point at which all the acts that constitute the burglary are finished. After that point of entry, the burglary, according to the statutory definition, has been completed, although the felonious or larcenous activity underlying the burglar's intentions may continue. One who forms the intent to assist after this entry may be found guilty of aiding and abetting this criminal activity; he may not be convicted of assisting a burglary already complete.

The majority also attempt to justify their holding by quoting our observation in *People* v. *Gauze* (1975) 15 Cal.3d 709, 715 [125 Cal.Rptr. 773, 542 P.2d 1365] that " '[b]urglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' Section 459, in short, is aimed at the danger caused by the unauthorized entry itself."

The majority conclude that this interest in personal safety defines the duration of the crime. "The appearance and assistance of an aider and

abettor, even if belated, contributes to and perpetrates the increased danger and risk. For example, an individual might learn of the perpetrator's earlier entry with the requisite intent, form his own intent to facilitate that offense, and commence acting as a 'lookout' at the point of entry, on behalf of the perpetrator. The presence of the 'lookout,' by prolonging the perpetrator's presence in the structure, may increase the chance of an encounter between the perpetrator and a returning occupant." (Maj. opn., *ante*, at pp. 1043-1044.)

Yet *Gauze*'s insight that the law of burglary is primarily interested in protecting personal safety cannot be used to justify the expansion of the statutorily defined liability for burglary. Indeed, the conviction of burglary in *Gauze* was reversed by this court. If the crime of burglary is intended to punish the unlawful entrant with the requisite intent, or his assistant, the larceny or felony laws are intended to punish one who, being innocent of helping the unlawful entry, assists the burglar in completing his criminal designs. The prosecution of the aider and abettor for the assistance in the commission or attempted commission of the felony or larceny that almost invariably follows a burglary is sufficient to protect personal safety against such postentry assistance of a burglar's criminal enterprise.

Finally, the majority misread our pronouncements on aider and abettor liability in *People* v. *Croy* (1985) 41 Cal.3d 1, 12, footnote 5 [221 Cal.Rptr. 592, 710 P.2d 392]. As we stated there: "Like the conspirator whose liability is predicated on acts other than and short of those constituting the elements of the charged offense, if the acts are undertaken with the intent that the actual perpetrator's purpose be facilitated thereby, he is a principal and liable for the commission of the offense. Also like a conspirator, he is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." But it does not follow from this that one who forms his criminal intent *after* the crime of burglary is completed may be held, as it were, *retroactively* liable for crimes committed prior to the formation of that intent. *Croy* merely reiterates the principle that an aider and abettor, or conspirator, is liable for the reasonably foreseeable crimes that issue from their criminal designs, whether or not those criminal acts are the ones specifically intended. But it is well established that "[a] conspirator cannot be held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed before he joined the conspiracy." (*People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260], italics in original.) Neither can an aider and abettor be held liable for crimes committed before he begins to assist the criminal activity with the required intent.

For all of the foregoing, I believe the majority err in concluding that an aider and abettor who forms a postentry intent to aid a burglar to carry out a

theft or felony is guilty of the burglary. Moreover, I believe that CALJIC No. 14.54 is an accurate statement of the law, and should be continued to be given where appropriate.

## II.

While dissenting from the majority's conclusion that the duration of a burglary lasts until the perpetrator's departure from the structure, rather than entry, I would affirm the judgment because I agree that, in this case, the judge had no sua sponte duty to give CALJIC No. 14.54 or a similar instruction. Although the evidence in this case certainly could have been interpreted to lead the jury to the conclusion that the defendant formed his intent to assist the perpetrator's criminal activity after the perpetrator had entered the structure, neither the prosecution nor the defense relied on such a theory, nor was that theory conspicuously implied from the evidence presented. Therefore, although it would have been proper for the trial court to have given the jury a CALJIC No. 14.54 instruction if so requested, the majority correctly conclude that the trial court was not obliged to uncover on its own theories that the evidence presented would not "strongly illuminate and place before [it]." (*People* v. *Wade* (1959) 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116].) On that limited basis I concur in the majority's judgment.